UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO
CIVIL ACTION NO. 4:06CV-00095-ERG

JERRI LEIGH JACKSON                                                    PLAINTIFF

VS.

THE SALVATION ARMY, INC., ET AL.                          DEFENDANTS

<u>MEMORANDUM OPINION</u>

<u>BACKGROUND</u>

Before the Court is a motion for summary judgment filed by all remaining Defendants, The Salvation Army, Inc. ("Salvation Army"), Major Paul Tilghman ("Major Tilghman"), Major Betty Jo McDonald and Major Michael McDonald (DN 70).  Plaintiff, Jerri Leigh Jackson ("Jackson"), has filed a 384 page response in opposition to the motion (DN 74) and Defendants have filed a reply memorandum (DN 75).

Jackson alleges she was fired because of her complaints of sexual harassment, her disability, her religion and in retaliation for filing a complaint with the Equal Employment Opportunity Commission ("EEOC") in violation of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act ("ADA") (DN 15).  Defendants have moved for summary judgment because the undisputed facts show Jackson was an "at-will" employee and her termination does not violate public policy (DN 70).  Having been fully briefed, these matters are now ripe for disposition.

STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if "the pleadings depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The inquiry under Rule 56(c) is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986); see also Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment...against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial..." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis of its motion and demonstrating the absence of any genuine issue of material fact. Celotex, 477 U.S. at 322-323. Once the moving party satisfies this burden, the burden shifts to the non-moving party to demonstrate there is a genuine issue of fact for trial. Anderson, 477 U.S. at 247-248. Although the Court must review the evidence in a light most favorable to the non-moving party, the non-moving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rule 56 requires the non-moving party to present "*specific facts* showing there is a *genuine* issue for trial," by affidavit, depositions, answers to interrogatories, and/or

2

admissions on file.  Fed.R.Civ.P. 56(c) and (e) (emphasis added); <u>Celotex</u>, 477 U.S. at 324.  The

substantive law governing the case will determine what issues of fact are material.  <u>Street</u>, 886 F.2d

at 1479-1480.  "Where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, the motion for summary judgment should be granted." <u>Pitts v. Michael Miller</u>

<u>Car Rental</u>, 942 F.2d 1067, 1069-1070 (6th Cir. 1991) (citing <u>Matsushita Elec. Ind. Co.</u>, 475 U.S. at

586).


<u>STATEMENT OF THE FACTS</u>

Jackson originally presented to the clerk's office in Louisville, Kentucky for filing

as a complaint a 69 page single-spaced handwritten document styled "Initial Motion Claim With

Notion Of Oral Argument" along with 11 spiral ring binders (each containing hundreds of pages)

and a tee shirt with notes fastened thereto (DN 1, 4).  The clerk supplied Jackson with a general

complaint form and directed her to fill it out with a condensed version of her complaint (DN 4).  On

the same day, Jackson returned with her "condensed" complaint which she filed with the Court

along with the 11 binders and tee shirt as exhibits (DN 1, 4).  Thereafter, the Court ordered

Jackson's complaint and all of the accompanying exhibits be stricken from the record because of her

failure to comply with Fed.R.Civ.P. 8 (DN 4).  The Court provided Jackson with 30 days in which

to pick up her complaint and all of the exhibits from the clerk's office (DN 4).  Additionally, the

Court provided Jackson 30 days in which to file an amended complaint that comported with the

Federal Rules of Civil Procedure (DN 4).

Within days thereafter Jackson filed an amended complaint on a general complaint

form with a 6 page handwritten supplement setting forth her damage claim (DN 5).  The amended

3

complaint alleges that Jackson was fired because of her complaints of sexual harassment, her disability, her religion and in retaliation for several past employment issues in violation of Title VII, Title I, and the ADA (DN 5).

Within days thereafter, Jackson filed a motion requesting the Court reconsider its ruling regarding her original complaint and exhibits (DN 7). Notably, in her supporting memorandum Jackson confirmed that she picked up her original complaint and all of the exhibits on July 27, 2006 (DN 7 at Pages 11, 12, 13, 17-18, 20, 21). The Court denied her motion because Jackson failed to set forth any valid basis for the Court to reconsider its prior ruling (DN 14). The Court also provided Jackson with an additional 30 days in which to file another amended complaint (DN 14). Notably, the order directed that the amended complaint "**shall not exceed 20 pages and shall not include more than 20 pages worth of exhibits**" (DN 14). In sum, the Court's orders (DN 4, 14) disposed of Jackson's original complaint (DN 1) and her amended complaint (DN 5) as well as provided her with the opportunity to file another complaint.

On November 7, 2006 Jackson filed a complaint setting forth on a Title VII complaint form with a 20 page handwritten supplement entitled "Amended Claim" (DN 15). This 20 page handwritten supplement is a rambling discourse of all perceived wrongs that the Salvation Army and some of its employees have done to Jackson (DN 15). It also sets forth her damage claim which includes entitlement to a fully furnished condominium in the Gatlinburg, Tennessee area and a 4-wheel drive vehicle (DN 15).

Filtering out her ramblings about irrelevant perceived injustices, this complaint and supplement allege she was fired because of her complaints of sexual harassment by a third party, her complaints of sexual harassment and bribery by her supervisor, her disability, her being a

4

baptized Morman, and in retaliation for her filing a complaint with the EEOC (DN 15).  Jackson believes her rights under Title VII and the ADA have been violated (DN 15).

The third party sexual harassment allegedly occurred while Jackson was working as a bell ringer at a donation kettle in front of a Wal-Mart store (DN 15).  She claims that a white male lowered her scarf and then touched her lips, cheeks, chin, nose and neck with his fingers and hands (DN 15).  Jackson asserts that her supervisor Major Tilghman fired her because of her complaints about this sexual harassment by the white male "prankster" (DN 15).  Jackson alleges when Major Tilghman fired her, he offered to write a personal check for the amount of her lost future wages as a seasonal bell ringer (DN 15).  Jackson believes this offer by Major Tilghman is sexual harassment as well as bribery for what he knew to be an unlawful firing (DN 15).

Defendants identified Dr. Michael R. Harris, a board certified forensic psychiatrist, as their expert witness and they provided his written report (DN 63).  The report indicates Dr. Harris formulated his opinion after reviewing the complaint and 20 page supplement; medical records Jackson provided through discovery; documents Jackson filed in previous legal actions; and the transcript of Jackson's deposition in this action (DN 63, Expert Report).  Essentially, Dr. Harris concluded the nature of Jackson's mental disabilities "do not appear to be amenable to reasonable accommodations without substantially altering the responsibilities of the position that she was hired to fill" (DN 63, Attachment).  Dr. Harris provides the following more detailed explanation:

> "Specifically Ms. Jackson's persecutory beliefs, her paranoid interpretations of benign and nonspecific stimuli (known as "ideas of reference"), and her obsessive focus on her status as a victim of those around her, rendered reasonable accommodations impossible to achieve in a position which by its nature requires unimpeded exposure to the public at large."

(DN 63, Attachment).

Jackson's own testimony indicates her mental illness has existed for many years (DN 71, Transcript of Jackson Deposition at Pages 19-47). Her treatment has included prescription medication as well as inpatient and outpatient care (DN 71, Transcript of Jackson Deposition at Pages 19-47). Over the years, Jackson's diagnosis has included paranoid schizophrenia, bipolar disorder, and depression with psychotic features (DN 71, Transcript of Jackson Deposition at Pages 19-47). In March of 2004, Jackson stopped taking prescribed medication because she believes her mental illness is in full remission (DN 71, Transcript of Jackson Deposition at Pages 19-47).

The Salvation Army hired Jackson as a bell ringer in the Madisonville, Kentucky area for the 2004 Christmas season (DN 71, Transcript of Jackson Deposition at Pages 30-31). Major Pearson supervised Jackson and the other bell ringers (DN 71, Transcript of Jackson Deposition at Pages 30-31). According to Jackson, Major Pearson knew about her mental illness and seemed to understand her need to frequently write "reports" to him about "little issues" (DN 71, Transcript of Jackson Deposition at Page 31). Notably, in one of her reports, Jackson accused Major Pearson of referring to her as "our little psychotic" while talking with a Wal-Mart employee and later that day while talking with his wife (DN 71, Transcript of Jackson Deposition at Pages 30-31). Based on the evidence in the record the Court cannot determine whether the incident was imagined or real. Jackson mentions this incident in the 20 page handwritten supplement to the complaint (DN 15).

The Salvation Army again hired Jackson as a bell ringer in the Madisonville, Kentucky area for the 2005 Christmas season (DN 71, Transcript of Jackson Deposition at Pages 31, 49). This time her supervisor was Major Tilghman (DN 71, Transcript of Jackson Deposition at Pages 31, 49). Apparently, they were acquainted with one another through attendance at the Salvation Army's church in Madisonville (DN 71, Transcript of Jackson Deposition at Pages

6

138-144).  Notably, Jackson has not alleged that Major Tilghman was aware of her Morman baptism at the time he fired her (DN 15).

How and when Major Tilghman became aware of Jackson's mental illness is not clear from the record.  Undoubtedly, her behavior in response to relatively benign events soon provided Major Tilghman with some insight regarding the impact that Jackson's mental illness has on her life. For example, her attempt to sell Salvation Army raffle tickets at a local shopping mall on November 20, 2005 (DN 71, Transcript of Jackson Deposition at Pages 138-143).  Jackson wound up fleeing the mall, fueled by the distorted belief that mall personnel and customers were part of a conspiracy to arrange her arrest for violating the mall's no solicitation policy (DN 71, Transcript of Jackson Deposition at Pages 138-143).  In her "report" to Major Tilghman, Jackson accused him of placing her in harms way (DN 71, Transcript of Jackson Deposition at Pages 138-143).  In the supplement to her complaint Jackson accuses Major Tilghman of arranging this incident to harm her (DN 15 at Pages 16-17).

Another example of Jackson's behavior in response to a relatively benign event occurred prior to December 2, 2005.  Major Tilghman apparently assigned her as a bell ringer at the VF Outlet mall (DN 71, Transcript of Jackson Deposition at Pages 58-61, 141-142).  According to Jackson, two women approached the donation kettle, drew her into a discussion about abortion, and then characterized an abortion she had undergone years earlier as "murder" (DN 15 at Pages 17-18; DN 71, Transcript of Jackson Deposition at Pages 58-61).  In her "Thrift Store report" and in person, Jackson confronted Major Tilghman as though he was somehow responsible for the incident (DN 71, Transcript of Jackson Deposition at Pages 58-61, 141-142).  The incident is mentioned in Jackson's supplement to the complaint (DN 15 at Pages 17-18).

7

On December 2, 2005, Major Tilghman assigned Jackson to a kettle at a Wal-Mart store in Madisonville (DN 71, Transcript of Jackson Deposition at Pages 79-84). To protect herself from the cold, Jackson wore a hat and wrapped her scarf around her neck and face (DN 71, Transcript of Jackson Deposition at Pages 79-84). Shortly before noon, an unknown lone white male approached Jackson and pulled down her scarf, exposing her face (DN 71, Transcript of Jackson Deposition at Pages 79-84). According to Jackson, he touched her face and lips with his fingers while making a comment about her still being pretty (DN 71, Transcript of Jackson Deposition at Pages 79-84). The white male then raised Jackson's scarf to again cover her face, inserted a dollar in the kettle, and walked away (DN 71, Transcript of Jackson Deposition at Pages 79-84). Jackson attempted to confront Major Tilghman about this incident.

First, she drove to the Salvation Army office (DN 71, Transcript of Jackson Deposition at Pages 79-84). However, the doors were locked and no one answered the door bell (DN 71, Transcript of Jackson Deposition at Pages 79-84). Jackson then returned to the Wal-Mart store, proceeded to the customer service desk, and used the telephone to call the Salvation Army office in an attempt to speak with Major Tilghman (DN 71, Transcript of Jackson Deposition at Pages 79-84). Jackson advised Nadine or Tamala that she needed to speak with Major Tilghman because an "uncomfortable thing" with a man had just happened at her kettle in front of the Wal-Mart store (DN 71, Transcript of Jackson Deposition at Pages 79-84). Notably, despite how serious Jackson perceived this incident to be, she did not formally report it to the Wal-Mart store (DN 71, Transcript of Jackson Deposition at Pages 79-84). Nor did she call the police.

After finishing out that day as a bell ringer, Jackson returned to the Salvation Army office and waited around to speak with Major Tilghman about the incident (DN 71, Transcript of

8

Jackson Deposition at Pages 79-90).  Jackson was frustrated by Major Tilghman's unwillingness to speak with the store manager about creating store policies she wanted put in place (DN 71, Transcript of Jackson Deposition at Pages 84-90).

Yet another example of Jackson's erratic behavior occurred the very next day.  This time, Jackson confronted Major Tilghman about Jerry, a bell ringer who was also working at the Wal-Mart store (DN 71, Transcript of Jackson Deposition at Pages 88-90).  Essentially, she believed Jerry was harassing and following her (DN 71, Transcript of Jackson Deposition at Pages 88-90).  Further, she confronted Major Tilghman about the presence of one of her relatives inside the store at the same time that she was using a store telephone to speak with Major Tilghman (DN 71, Transcript of Jackson Deposition at Pages 88-90).  Apparently, Jackson believed that Major Tilghman was somehow responsible for the relative showing up at that time.

Jackson's deposition testimony and her supplement to the complaint are replete with examples of imagined discussions that other people were having about her and her past problems (DN 15; DN 71, Transcript of Jackson Deposition).  She refers to such conversations as "networking" (DN 15; DN 71, Transcript of Jackson Deposition).

Jackson's testimony indicates that despite her two bad days at the Wal-Mart store, Major Tilghman gave her another chance and assigned her to a kettle in front of the Kmart store (DN 71, Transcript of Jackson Deposition at Pages 90-91).  It is not clear from the record whether Jackson had any problems while working at the Kmart store.  The following morning, December 6, 2005, Jackson met with Major Tilghman at the Salvation Army office (DN 71, Transcript of Jackson Deposition at Page 93).  According to Jackson , Major Tilghman gave her the day off because her problems were causing him too much stress (DN 71, Transcript of Jackson Deposition at Pages

93-96).  Yet she also believes that Major Tilghman terminated her employment during that meeting (DN 71, Transcript of Jackson Deposition at Pages 94-96).  Jackson also recalls him offering to write her a personal check for the wages she would have earned through December 24th (DN 71, Transcript of Jackson Deposition at Page 96).  Apparently, Major Tilghman gave Jackson a letter at some point during the meeting (DN 71, Transcript of Jackson Deposition at Page 95).

Immediately following her meeting with Major Tilghman, Jackson got in her car and drove to the Salvation Army headquarters in Louisville, Kentucky (DN 71, Transcript of Jackson Deposition at Pages 69-70).  When she arrived she met with Major Betty Jo McDonald and another man whose name she does not recall (DN 71, Transcript of Jackson Deposition at Page 69).  During this meeting Jackson showed them the letter from Major Tilghman (DN 71, Transcript of Jackson Deposition at Page 69).  Jackson asked the people in Louisville to intervene on her behalf and rescind Major Tilghman's decision to terminate her employment (DN 71, Transcript of Jackson Deposition at Pages 69-70).  According to Jackson, Major Tilghman faxed all of her "reports" to the Salvation Army headquarters in Louisville along with the explanation that he was letting her go because of too many problems and she was writing too many things (DN 71, Transcript of Jackson Deposition at Page 142).  Based on her meeting with the people in Louisville, Jackson believed that she would be returning to her work as a seasonal bell ringer in the Madisonville area (DN 71, Transcript of Jackson Deposition at Pages 68-77).

When Jackson arrived at the Salvation Army office in Madisonville on the 8th of December, Major Michael McDonald greeted her at the door (DN 71, Transcript of Jackson Deposition at Pages 70-71).  It was snowing at the time and Major McDonald explained that due to

the snow storm there would be no work that day (DN 71, Transcript of Jackson Deposition at Page 71). Jackson recalls being called later that day and asked to return to work on the following morning (DN 71, Transcript of Jackson Deposition at Page 71).

The next morning, December 9th, Jackson showed up at the Salvation Army office in Madisonville and was directed to meet privately with Major Betty Jo McDonald (DN 71, Transcript of Jackson Deposition at Page 72). Jackson's testimony indicates at the outset of this meeting Major Betty Jo McDonald indicated she would be returning to work as a bell ringer (DN 71, Transcript of Jackson Deposition at Pages 71-77). However, the tenor of the meeting changed when Jackson became confrontational (DN 71, Transcript of Jackson Deposition at Pages 73-77). The meeting ended with Jackson's termination (DN 71, Transcript of Jackson Deposition at Pages 71-77). In Jackson's mind the Salvation Army was toying with her by first indicating she was fired, then telling her that she could work, and then when she came to work telling her that she is fired (DN 71, Transcript of Jackson's Deposition at Page 74). She refers to this as "employment seduction" (DN 71, Transcript of Jackson Deposition at Page 74).

On the night of December 9th, Jackson returned her bells and apron to the Salvation Army office in Madisonville (DN 71, Transcript of Jackson Deposition at Page 76-77). Jackson recalls filing her EEOC complaint several days after December 9th (DN 71, Transcript of Jackson Deposition at Pages 75-79).

DISCUSSION

A

Defendants argue that Jackson was an "at will" employee (DN 70). In her 384 page

11

response to the motion for summary judgment, Jackson did not dispute this issue (DN 74). Further, in her deposition she conceded that an "at will" employment relationship existed between herself and the Salvation Army (DN 71, Transcript of Jackson Deposition at Pages 54-55).

The "at will" employment doctrine states that an employee may quit or an employer may discharge an employee for good cause, for no cause, or for cause that some might view as morally indefensible. Firestone Textile Co. Div. v. Meadows, 666 S.W.2d 730, 731 (Ky. 1983). However, an employer in Kentucky can be liable for terminating an "at will" employee where the termination violates a statute or the public policy behind it. Southerland v. Hardaway Management Co., Inc., 41 F.3d 250, 256 (6th Cir. 1994); Meadows, 666 S.W.2d at 732-733. Essentially, Jackson's complaint and supplement (DN 15) allege this public policy exception applies to her termination.

B

Jackson's 384 page response to the motion for summary judgment fails to meaningfully articulate her wrongful discharge claim under Title VII (DN 74). Mere conclusory statements regarding alleged discrimination, that are unsupported by specific facts fail to raise a genuine issue of material fact and are insufficient to survive a motion for summary judgment. Ackerman v. Diamond Shamrock Corp., 670 F.2d 66, 69-70 (6th Cir. 1982). In sum, Jackson simply offers no evidence or legal authority to support her Title VII claim. Therefore, the Court concludes that Defendants are entitled to summary judgment on Jackson's Title VII claim set forth in her complaint and supplement (DN 15).

C

The ADA proscribes discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, Jackson must show she is (1) a disabled person within the meaning of the Act [1]; (2) who is otherwise qualified to perform the essential functions of her job with or without reasonable accommodation; and (3) that she was discharged solely by reason of her handicap. Sullivan v. River Valley School Dist., 197 F.3d 804, 810 (6th Cir. 1999); Monette v.

---

[1]The Act defines a disabled person as one who (1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (2) has a record of such impairment, or (3) does not have an impairment, but is regarded as having one. Sullivan v. River Valley School Dist., 197 F.3d 804, 810 (6th Cir. 1999) (citing 42 U.S.C. § 12102(2)). The regulations define the phrase "substantially limits" as follows:

"(I) Unable to perform a major life activity that the average person in the general population can perform; or
(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."

29 C.F.R. § 1630.2(j)(1) (1996). The phrase "major life activities" is defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I). Interpretive guidelines explain the above list "is not exhaustive" and that "other major life activities include, but are not limited to, sitting, standing, lifting, [and] reaching." 29 C.F.R. Pt. 1630 App.; Penny v. United Parcel Serv., 128 F.3d 408, 414 (6th Cir. 1997). In deciding whether an individual is substantially limited in a major life activity, the Court should consider the following factors:

(I) The nature and severity of the impairment;
(ii) The duration or expected duration of the impairment; and
(iii) The permanent or long term impact, or expected permanent or long term impact of or resulting from the impairment."

29 C.F.R. § 1630.2(j)(2).

Electronic Data Systems Corp., 90 F.3d 1173, 1178 (6th Cir. 1996).

Defendants concede, at least for the purpose of its summary judgment motion, that Jackson is a disabled person within the meaning of the ADA (DN 70). Defendants have moved for summary judgment because they believe Jackson cannot make a prima facie showing as to the second requirement in the foregoing framework (DN 70). Specifically, Defendants argue due to the functional limitations imposed by her mental illness, Jackson is not otherwise qualified to perform the essential functions of the seasonal bell ringing job with or without reasonable accommodation (DN 70). In support of their argument, Defendants rely on the unrebutted opinion of their expert witness Dr. Michael Harris (DN 70).

Jackson's 384 page response is not sufficient to survive a motion for summary judgment on this question (DN 74). She has not raised a genuine issue of material fact by presenting an expert's opinion that rebuts Dr. Harris' opinion (DN 74). In sum, the Court concludes that Defendants are entitled to summary judgment as to Jackson's ADA claim.

### D

Jackson also alleges her termination was in retaliation for her filing a complaint with the EEOC. The evidence taken as a whole and viewed in a light most favorable to Jackson shows that Jackson filed her EEOC complaint ten days after her employment was terminated. Moreover, the evidence shows Jackson was terminated because the functional limitations imposed by her mental illness made her unqualified to perform the essential functions of the seasonal bell ringing job and no reasonable accommodation could overcome this problem. No jury could reasonably find otherwise on this evidence. Thus, the Salvation Army is entitled to summary judgment in its favor

on this claim.

CONCLUSION

For the foregoing reasons, the Court concludes that Defendants' motion for summary judgment should be GRANTED.  The Court will issue a separate order granting Defendants' motion for summary judgment.

Copies:        Plaintiff, *pro se*
               Counsel of Record